On the severance question, Mr. McAllister. Mr. Chief Justice, and may it please the Court, the joint sentencing proceeding in these cases did not violate the Eighth Amendment because each defendant received the individualized sentencing determination to which he was entitled. Each presented all of the mitigating evidence he chose to produce. The jury instructions explicitly told the jury to consider each defendant individually. In fact, there were several separate instructions, some that related only to one defendant or only to another defendant. The jury for each defendant then had to complete a specific verdict form. And this jury had already proven its ability to distinguish between these two defendants when it convicted one of some counts in the original guilt phase, which it acquitted the other. The only way the Kansas Supreme Court gets to an Eighth Amendment error in this case, well, really, there are two points. One, it relied upon possible, and in one instance, not even, violations or errors of state law to find a prejudice that rose to an Eighth Amendment level. And two, it disregarded altogether with really no explanation the longstanding foundational principle that juries are presumed to follow their instructions. The two state law errors, arguably, that the Kansas Supreme Court found, one was the admission of evidence of the sister who made the comment about, Reginald may have told me he shot those people, well, that's not even an error of state law. They said basically that's prejudicial, it might not have come in if they'd been tried separately, but in fact, that evidence would be relevant to aggravator number one, that the defendant killed multiple people. That would have been admissible evidence, and that just can't be an Eighth Amendment violation. But the Kansas Court found, independent of the severance question, that there was constitutional error in the admission of hearsay. That's the third question presented in the cert petition on which the Court has not taken any action yet, Your Honor. Ginsburg. But when it goes back to Kansas, they can still say, thank you for telling us about severance, but we had this other round that leads to the same bottom line. Well, and we are certainly hopeful that the Court will take another look at that second question, depending on its resolution of the two questions that are in front of it today. But if it goes back in that posture, yes, they would have another ground. Was any evidence introduced with respect to one of the defendants that could not have been introduced against the other, had there been severance? The only arguable evidence, really, Justice Kennedy, is what Reginald refers to as the corrupting influence. But even that, arguably, would be relevant to the mercy consideration to show his character, the nature of this person that's being sentenced. And that was the notion that his mother testified, that sometimes, of course, Jonathan looked up to his big brother, and maybe sometimes Reginald was a bad influence on him. But that was really the extent of that evidence, and that might have come in as a rebuttal to a mercy argument. The Kansas Supreme Court did not really definitively say that was even state law error, but even if you assumed it was, it would only be state law. Sotomayor, what constitutional standard you're asking us to apply? I mean, this argument goes to harmless error, a serious position to take that even if there was error, no foul, a foul, but no penalty, okay? But what standard are we applying? We're not applying the rule, or are we, or should we apply the Rule 14 standard? No, not for Eighth Amendment purposes, Your Honor. Kansas would propose, and I suspect the United States can propose something as well, but it's a very high standard as an Eighth Amendment matter, and we would say, we would be content to accept something like a serious risk that a defendant will not be able to receive individualized sentencing. It's sort of molding the traditional notions of joinder with the Eighth Amendment consideration, because that seems to be the only Eighth Amendment consideration here is the individualized sentence. The Eighth Amendment, or is it due process? Well, you could use a due process standard, Justice Scalia, which we'd also be fine with, the question would really be, did joinder so infect the process with unfairness that the proceedings are fundamentally unfair? That seems like a language that's relevant, rather than cruel and unusual punishments language. Well, and that's exactly what this Court said in Romano v. Oklahoma, a case in which the defendant's other death sentence in a separate case was admitted against the defendant in the sentencing proceeding. That sentence later got reversed, and the Oklahoma Court said the jury should not have heard about his other sentence as a matter of state law. That defendant, Romano, said it's an Eighth Amendment violation, and it's a due process violation. The Court said the Eighth Amendment doesn't have anything to say about what's admissible, really, and that's state evidentiary rules. That's not an Eighth Amendment issue, and the Court went on to address the due process claim in Romano, applying that very standard. And as we suggest the Court should do here, one of the things it pointed to specifically was jury instructions that said these are the aggravating circumstances you may consider, you may not consider any others. The Court said we presume the jury follows its instructions, and nothing in the instructions gave the jury here any way to give effect to that improperly admitted evidence. And that's true here to the extent Reginald Carr argues some of this evidence was really used as a non-statutory aggravating circumstance. By statute, Kansas does not allow anything other than statutory aggravating circumstances. In the instructions, number 5, I think, for Reginald, number 7, for Jonathan, very explicitly and clearly say here are the four aggravating circumstances the State has alleged, and then the next paragraph, you may not consider anything else as an aggravating circumstance. So in our view, the most the Kansas Supreme Court could come up with is potential violation of State law if, in fact, the evidence, which is minimal in the greater scheme of this proceeding, that Reginald was a corrupting influence on Jonathan, if that would not have been admitted. That's really all the Kansas Supreme Court is left with to hang its hat on in finding and saying there's an Eighth Amendment violation here. Kennedy. Can you tell me, if you are aware, in other States, or perhaps even in Kansas and other trials, is it a common practice to sever when there, for the penalty phase, when there are two, multiple defendants? Justice Kennedy, I think in the briefs, I don't remember the exact page, there are two States that mandate severance, one, Ohio, and that's, I think, Georgia and Mississippi. And this is just for penalty phase? I think it's for the entire proceeding. And then Ohio, there's a presumption in favor of severance, but all the other States, there is nothing that mandates or even, I think, creates a presumption. It would be very difficult for the trial judge to decide which should go first. It would, and that's one of the reasons. I mean, not just judicial economy, but in a sense, overall fairness. Yes. Having them tried together and you don't have one defendant having an opportunity to preview the evidence that the State may present and the arguments that may be made, this Court has recognized that potential tactical advantage in other jointer cases. Of course, it's not had a jointer capital case like this, but in other circumstances, that's a factor. The Court has also emphasized the consistency of determinations with respect to facts. We're not saying the outcomes have to be the same, but when the evidence, the mitigation evidence, is 99 percent overlapping, they were using the same witnesses, even their experts were co-authors. They were testifying to the exact same things, essentially, about each brother. All that overlapping evidence, what this allows is a consistent determination by the jury in evaluation of all that mitigating evidence. And it leads to whatever outcome the jury decides, but the jury was very clearly told to consider each defendant individually, and that's what they got, was individual consideration. I would say, also, you know, remember, even if this Court were to think there were some kind of error, which Kansas simply does not see here, again, at most, possibly, an error of Kansas law, not an Eighth Amendment violation, it would have to be harmless under any standard, and Kansas would accept any standard that is beyond a reasonable doubt, certainly here. Given the four uncontested aggravating circumstances. Breyer, you'd also have to look at the top of your head, maybe, forget it if you don't. What I thought I would do is I wanted to look to the aggravating circumstances. What were they? What were they? Let's call it he was the monster approach. Reginald was the monster and Jonathan was the puppet or whatever. I want to look at the aggravators. I also want to look at the mitigators that Reginald said existed, and then see if this comparative monster, let's call it, fits into any of them. You know where the pages, where they are, just by chance? Well, I think the — in terms of the — yes, I can. The aggravating circumstances are set forth in the instructions, Justice Breyer. So — Okay. I know where they are. Yeah, instruction number five for Reginald, instruction number seven for Jonathan, and then following each one, so I believe instruction number six and instruction number eight. But the mitigating, those are the statutory mitigating circumstances. So what happens in these cases is the jury is told, here are the statutory, and we list all of them that are listed in the Kansas statute. Where on what page do you list them? Well, so those are listed in instruction number six and instruction number eight. It's all in the Petition. If it fits in, then I guess what I have to do is go through this huge record on the sentencing anyway and see, do I really think that this evidence that came in, that the younger one thought the older one was the monster, et cetera, did it really have an effect? Well — Is that what I have to do? I don't see how I could avoid that if they're at all relevant. Well, I would say, first of all, if you were to do that, it would be quite clear. The evidence is overwhelming, but furthermore, the premise is not supported really by the record. They say Jonathan's whole strategy was to paint Reginald as the bad actor here. That's not really what happened. What they both presented was lots of witnesses and testimony about their childhood and their experiences growing up. And they presented psychological experts to talk about their mental condition. No expert said Reginald had some kind of psychological control over Jonathan. That testimony, to the extent it's there at all, comes from their mother. But what do you think about a case, whether or not this is that case, in which it's quite clear to a judge that each of two defendants is just going to be pointing to the other person and saying, that was the bad actor, he's why these terrible crimes committed. And you know that each of them is going to be doing that. Should a judge separate the penalty proceeding in that context? Well, not necessarily. If a high standard is met, that it will not be possible, perhaps, to give individualized consideration to each in an eighth amendment or a due process standard. It's going to be so fundamentally unfair. You can meet that very high standard, but that's always been the court's approach. It's a case by case determination, even Zafiro, which is a joinder case. Well, I guess I'm asking you, in what kind of factual circumstances you would find that standard met? Rarely, but I think it would be, certainly the court has recognized in Bruton, you have some sort of co-defendant confession. I mean, confession situations, if there was something that had not been used in the guilt phase, might be relevant in the sentencing. That might be so prejudicial. We have tried to think of other examples. I might suggest something like one is claiming, at that point in time, some kind of insanity, even though they didn't succeed on that at trial. If there was something really starkly contradictory in their presentations, and you were going to get a lot of evidence about one that really had nothing to do at all with the other. But we do believe it's a high standard that would rarely be satisfied, especially given the court's longstanding presumption that the jury follows its instructions. And that's one thing I'd point out here. The complaints that each makes in this court, first of all, at least one of those complaints really wasn't even made in the Kansas Supreme Court, much less the trial court. And that's the shackling of Reginald and whether that might have prejudiced Jonathan. But there was no complaints during the sentencing proceeding. This corrupting influence evidence is relevant only for limiting instruction, Reginald has antisocial personality disorder. There was no request for any sort of limiting that that's not applicable to Jonathan. Although, of course, the irony there is that Jonathan's own expert all but diagnosed him as antisocial personality. He said out of 26 risk factors that the Department of Justice has recognized for violence and sexual violence, Jonathan has 24 of them. And both brothers talked about family history of mental illness. Both brothers and their experts talked about whether some of these things were hereditary or genetic. This was really a case in which it made very good sense to proceed with a joint proceeding. Because the evidence, 99%, was overlapping, essentially. And they were calling the same witnesses, taking turns with those witnesses. Judicial economy nor fairness, neither one would have been served any better by separating this into two proceedings. And in fact, I will conclude for now, unless there are further questions, with this observation that prior to trial, to the guilt phase, the prosecution actually offered to have two juries sit through this proceeding. Jonathan's attorney said he would consider it, and Reginald's attorney rejected it. So the State even tried to agree to some workable system, and it was declined. So unless there are further questions, I'll reserve the remainder of my time.  Ms. Kovner? Mr. Chief Justice, and may it please the Court. The Kansas Supreme Court erred when it found that the State violated the Eighth Amendment by conducting joint sentencing proceedings for the crimes that respondents committed together. Joint proceedings can enhance accuracy and fairness as a long line of this Court's cases hold. They provide a fuller evidentiary record to juries that are assessing relative culpability. And they prevent arbitrary disparities that may arise when two juries reach inconsistent conclusions about the common facts of a single crime. Mr. Kovner, is there any difference between the Federal Government's position and the position of the State of Kansas on this question? As to the standard, I think there's a small difference. I think our proposal is that the constitutional standard is whether evidence or argument resulted in a denial of due process or the deprivation of an individualized sentencing proceeding. And that's slightly different from Kansas's standard, because Kansas is proposing a rule that involves analysis of risk, and we think that's part of the statutory rule under Rule 14, as Justice Sotomayor alluded to. It's also part of the statutory standard that States, by and large, are applying. But we think the constitutional question is, just was this person deprived of a fair trial by the evidence that came in? And that's the constitutional question. Kagan, when you said it the first time, you had deprived of a fair trial and then said something about individualized sentencing. Is that right? Is that supposed to indicate that this is deriving both from the due process clause and from the Eighth Amendment? Well, the Eighth Amendment does speak to this need for an individualized sentencing determination. We would think that the due process clause also requires the proceedings be individualized, but we would agree that if there were a situation where there was a joint trial and because of the evidence introduced by one, for instance, a jury simply could not give a second defendant, that would be a constitutional problem. And to give an example of that, I mean, I think the example the Court suggests in Zafiro of that is where there's aggravating evidence that pertains only to one defendant, but that that aggravating evidence is just so prejudicial and so overpowering that the jury couldn't really separate the two and would be inclined to sort of judge the second one by association. So I think that's the example the Court gives in Zafiro. But it's not the case. Sotomayor's consideration is required even in non-capital cases? Absolutely, Your Honor. So I think it's really a due process consideration, isn't it? I think due process encompasses that requirement of individualized consideration. Just to address several of the points that came up during Petitioner's argument, as to the question that Justice Kagan asked about whether when defendants are simply pointing the finger at each other, that would necessitate severance, I think that's the question that the Court addressed in Zafiro, where that was essentially the claim the defendants were making, that we're both going to point the finger at each other at trial. And the Court said that doesn't necessitate severance, that that may, in fact, increase the jury's ability to reach an accurate verdict, to reach an accurate assessment of relative culpability and enhance fairness. So we don't think that that's a situation that would require severance. Roberts. Roberts. I guess the strongest evidence for Reginald is Tameka's testimony. It's pretty prejudicial. She said he's the one who he said he's the one who shot. I don't think that that's prejudicial evidence. Certainly not any constitutional problem with the admission of that evidence. I don't think that even Reginald Carr is asserting that that evidence couldn't have come in against him. Rather, he's asserting, or the State below suggested, the State court below suggested, maybe that maybe the State didn't know about that evidence, and maybe just as a factual matter it wouldn't have come in. But there's no constitutional unfairness with evidence coming in on a co-defendant's case that's harmful but accurate as to you. That's something the Court said in Zafiro. If it's accurate and relevant evidence that comes in on a co-defendant's case, there's no constitutional unfairness as to you. I think Reginald's primary claim before this Court is that there was a violation of State evidentiary law because some of the other evidence, the evidence of bad influence, might not have come in under the State rules. But I think this Court's cases are clear that a violation of State evidentiary law is simply a matter of State law. The State could decide that necessitates reversal, but it's not a constitutional error. That's what this Court said in Romano.  Breyer. Breyer. It depends on what it was, wouldn't it? I mean, so so I'm still asking the same question. If the, I take it that Reginald could not have introduced evidence refuting the brother's state of mind that he was the monster. That's what you're referring to by the bad influence. So the jury might have taken that evidence into account in trying to decide whether Reginald, for other reasons than in the statute, was a sympathetic enough character not to provide the death penalty. That's conceivable. But severance is very, very rare, and joint trials are very common. And very common is the claim on an appeal in any kind of a case that it should have been severed. So do you have cases that you can think of that would be good precedent for you where a court, including particularly this Court, said, of course, there might be a little prejudice here, some, but it's not enough to warrant severance? Because I think what I have to do is read the record on this point, and then I need something to compare it with. Well, I want to go back. I'd like to answer the question and then go back to the premise, because I'm not sure I agree with the premise. But as to whether any prejudice is a problem, I think the best case for us is Zafiro. Zafiro talks about the idea that what you need, that Joinder is presumably going to enhance fairness and accuracy, and what you need is substantial prejudice, even to have a statutory problem, and then, even then, we're going to presume that a limiting instruction would be sufficient to cure it. So I think that would be our best case on that point. But, Your Honor, I think the inquiry under the Eighth Amendment has to be, would the Constitution have prohibited this evidence from coming in as to Reginald Carr? And we think the answer is no.  Breyer, I don't know if you call that due process, maybe you do, but that's the kind of argument which seems for a quantitative weighing, and that's why I asked the question. I think I would go back to Zafiro again on that one, Your Honor, because I think Zafiro establishes that when accurate evidence comes in through a codefendant that's relative, that's relevant to the jury's determination, that's not prejudice. That's information that may enhance the accuracy of what the jury is. Sotomayor, could you tell me why we should apply the Zafiro standard, which was joint trials, but this is joint sentencing, where there's a different why there should be exactly the same standard applied? You need individualized sentencing, so can't you say, or aren't you required to say that something a little bit more than the efficiency of a joint trial has to compel, has to be considered? Yes, Your Honor. We agree that sentencing may involve special considerations. What we think Zafiro establishes is that generally when more relevant information is placed before a jury, that's not prejudice to a defendant, that's not unfair, and that juries with more information are likely to make more accurate decisions, and we think that's equally true with sentencing. And similarly, that juries with more who are confronted with two defendants together can avoid the unwarranted disparities that may occur when juries reach different results, two different juries considering the same facts reach different results on those facts, and that's equally true with sentencing. You would need two separate juries, wouldn't you? I mean. That's what the Kansas Supreme Court said here, and the result of that is going to be that two different juries confronted with the very same aggravating circumstances in largely parallel mitigation cases may simply weigh factors like mercy differently. Wouldn't the second jury have to know the facts relevant to mitigation, as well as aggravation, I suppose, that came out in the main trial? It's certainly possible, Your Honor, that if there was a second jury, the government could simply introduce, for instance, the evidence of Reginald Carr's statements to his sister at the second trial. So you're introducing this disparity that Justice Kennedy alluded to between the defendant who goes first and the defendant who goes second. But would the second jury have been present for the guilt phase? Well, in the Federal system, there are a number of ways you could do it. You could have two juries that hear both the guilt phase and the penalty phase. You could have a second jury impaneled only for the penalty phase. But then in a case like this, you would need to essentially repeat all the trial evidence, including calling victims again, because that the State was relying on its evidence from the trial phase, and that's generally what's going to be the case. Kagan. Kagan. I think I missed something you said, but forgive me. But the constitutional standard that you're proposing, is that a constitutional standard for both the guilt phase and the sentencing phase, and is it also for both non-capital and capital? Are you drawing no distinctions among those four things? I think that's right, Your Honor, because we think that the due process standard essentially subsumes the requirement of individualized consideration, and, of course, due process is applicable at the trial phase and at the sentencing phase and in capital and non-capital trials. So it seems a little bit counterintuitive to me, the idea that, you know, the guilt phase of a very minor crime would have the exact same standard applicable to it as the guilt phase of a capital crime and then as the sentencing phase of a capital crime. If I may answer very briefly, Your Honor, we think the reason that's the case is that joint trials often enhance accuracy and fairness. So we agree that accuracy and fairness considerations are at their paramount in capital cases, but we don't think that militates for a different standard in capital cases, because we think that the standard the courts are applying is one that's going to generally enhance those values. Roberts. Thank you, counsel. Mr. Liu. Mr. Chief Justice, and may it please the Court, I want to begin by emphasizing how narrow our rule is. Justice Kagan asked a question involving a case where the two defendants pointed their fingers at each other. We're not advocating a rule that would require severance in any case where two defendants point their fingers at each other. We're advocating a rule that this Court has recognized in Zant, Stringer, and Sanders that an Eighth Amendment violation occurs when the weighing process itself is skewed. And the weighing process is skewed. Breyer. Are you saying the severance rule is the same in noncapital as in capital cases? The general severance rule, Your Honor, is the same. And you just look for prejudice. Exactly. The general rule is you can't have severance when it would compromise someone's constitutional rights. The right at issue here just happens to be an Eighth Amendment right. But we're not advocating an Eighth Amendment rule that would apply beyond the capital context or even beyond the penalty phase. Now, if you violated an individualized sentence, why would we apply harmless error review, meaning it seems counterintuitive. We're now becoming the sentencing judge, the sentencing body, no? Absolutely. And I think it's the same. So then we have to do the – in harmless error, we have to decide whether the aggravators outweigh the mitigators, et cetera, so much that none of the error could have affected that choice? Well, this Court, Your Honor, recognized in Satterwhite precisely how difficult it would be to conduct a harmless error analysis in a penalty phase. And that's precisely because there are so many factors involved. Sure, the crimes in this case were horrific, but that's just one side of the scale in a harmless error inquiry. There's an entire other side of the balance, the mitigation side. And so it is quite difficult for this Court, on a cold record, to go through the harmless error analysis. Well, we have to do it, though, right? I mean, that's part of our jurisprudence. So what do you think are the factors that would suggest the jury would have come out a different way had the rule that you urge been adopted? What specifically? One is the shackling of the co-defendant? Well, we're not – representing Reginald Carr, we're not basing our claim around the shackling. Our claim revolves around the evidence that Jonathan presented, that Reginald had a corrupting influence on him while they were growing up. And that evidence, as the Kansas Supreme Court itself held at Petition Appendix 411, falls beyond the rubric of any valid sentencing factor. But, Mr. Liu, I mean, given the kind of evidence that was presented in this case, the idea that somebody was a lousy big brother seems pretty small on – in the scale of things. Well, a few responses to that. To begin with, I think Your Honor is understating the evidence here. This wasn't just that Reginald was a lousy big brother. It was that he did things to Jonathan that turned Jonathan into the person who was capable of committing and even leading these crimes. So this wasn't just lousy big brother evidence. This was evidence that Reginald himself was the source of what caused Jonathan to do the things he did. But, Your Honor, I think it's also important to keep in mind two separate parts of the inquiry. There is the violation and the harmless error analysis. And this Court said in Stringer that even a thumb on the scales is enough to skew the weighing process in violation of the Eighth Amendment. But what evidence that shouldn't have been admitted wouldn't have been admitted in a separate trial? Well, all this evidence, Mr. Chief Justice, that says Reginald was a corrupting influence on his brother, that wouldn't have come in in a separate trial for two reasons. Number one, as the Kansas Supreme Court held at Petition Appendix 411, that evidence was improper, non-statutory, aggravating evidence, which is to say all the aggravating factors, the four that the prosecution pursued in this case, all had to do with the circumstances of the crime. But this evidence had nothing to do with the circumstances of what happened on December 15th. It had to do with the defendant's character concerning circumstances that occurred years, even decades, before the crimes at issue. Now, wait a minute. You're representing the brother who was the alleged corrupting influence, right? That's right. The corruptor. But the corruptor was sentenced by the same jury to death. So how could it possibly be that without the corrupting action of your client, the jury would have sentenced your client to life, even though the corruptor was sentenced to death? That doesn't seem to me at all likely. Well, to begin with, I don't think Jonathan Carr's sentence is a proper baseline to use. As my friend will argue in a few minutes, his own sentence was prejudiced by severance. But even moving beyond that, there's every reason to believe that the jury viewed Jonathan as overall more culpable than Reginald. After all, the State never established who the shooter was here. If the jury believed that Jonathan was the shooter, the jury could have believed that Jonathan was so culpable that even with this evidence that he had been corrupted by Reginald, it would have given a life sentence. I think the jury would have believed that. Scalia, let me put the crime to you. You tell me which of these descriptions of the crime are incorrect. These two men broke into a house in which there were three men and two women. They ordered the five to remove their clothes, forced them into a closet. Over the course of three hours, they demanded that the two women perform various sexual acts on one another. They demanded at gunpoint that each of the three men have sexual intercourse with both women. Then Reginald drove the victims one by one to various ATMs to withdraw cash. Jonathan raped or attempted to rape both women twice. And Reginald raped Holly G., who later testified, once. Placing the three men, still naked, in the trunk of one of their cars, the cars drove all five to a soccer field, forced them to kneel in the snow, and shot them execution style in the back of the head. One of them, fortuitously, was not killed because I think it was a hair clip that she was wearing deflected the bullet. And she is the one who testified to all of this activity. And you truly think, oh, and they ran over her, too, after shooting her in the head. The car ran over her. You truly think that this jury, but for the fact that your client was a corrupter, would not have imposed the death penalty? We do, Justice Scalia. In your own opinion, last term in Glossop, you noted that the egregiousness of an offense is just one factor in determining whether a sentence is appropriate at the penalty phase. And Reginald Carr submitted a week and a half full of mitigation evidence that extenuated this offense. So I don't – I think when you take all that all into account and consider the fact that this wasn't an easy case for the jury. The jury, after all, deliberated a full day on what Kansas thinks is quite an easy case. I think that the scales of the weighing process were much more evenly balanced than that. Do you think that the desire to spare Holly from having to testify more than once is a relevant factor here? And if so, how could that be – how do you – how would you propose to accommodate that? It's not a relevant factor, and that's not my saying it. It's this Court saying it. This Court in Zofiaro and Bruton has said that the benefits of joinder, while they may exist, cannot come at the price of constitutional rights. So while I completely appreciate that severance would require some duplication of resources, that's precisely the sort of benefit that this Court has said cannot trump the Eighth Amendment. Breyer. So if you're right, joinder being among the most common kind of thing with gangs and drugs and so forth, why won't the same argument be made over and over, preventing requiring severance in dozens and dozens, perhaps hundreds of cases, where the government tries people together? Because they'll say there are different relationships among the members of the gang, those relationships some evidence will come in that would negative the relationship that would tend to show that this particular individual wasn't actually involved in this aspect of it, et cetera. That's why my experience on the courts, lower courts particularly, leads me to think it's a very rarely accepted argument, severance. And that's why I'm interested in the question. Because if it were, you'd find very unusual to try people together, which, in fact, is very usual. And so when you told me there's no separate thing for the death cases, then I imagine it would affect every criminal trial of gangs throughout the country. And that is something that's concerning me, and I'm looking for an answer. You're absolutely right, Justice Breyer, that under our rule, the circumstances of each case are relevant. But I think what's also important is that the circumstances of some cases might not give rise to severance. That's what I'm looking for. Why is it you believe that if I were to decide in your favor on this case and find the sufficient prejudice to warrant severance here, I wouldn't at the same time be throwing a huge monkey wrench into the ordinary cases of gangs, drugs, et cetera, where joinder is very common and reversal is very rare? Because the evidence here is special in the sense that it fell beyond any existing sentencing factor. Are you proposing just separate sentencing hearings, or are you proposing separate juries for each of the brothers? Well, the Kansas Supreme Court in this case ordered as its remedy a new trial with two juries. But I don't think that is necessarily going to be the required remedy in every case. There are different ways, Justice Ginsburg, to solve the problems of separation. Let's take this case. If you had only one jury and Jonathan goes first, that jury, when it gets to Reginald's case, is not going to forget everything it heard in Jonathan's case. You're absolutely right, Justice Ginsburg. I don't think a sequential solution with Jonathan going first is going to work in this case, precisely because the jury won't be able to unring the bell of the precisely the evidence we think is prejudicial in this case. But that's not to say that a sequential solution isn't going to work in the mine run of cases. This case is special just because there is some allegation that the prejudice ran both ways. Kennedy. But the minute you defend the idea of two different juries, then you sacrifice the desirability and the possibility of consistency. Well, Justice Kennedy, there are many ways that States have developed to resolve the problem of inconsistent verdicts among different juries. One way is what the Georgia State has done, which is have proportionality review. They ask the appellate courts to look across many sentences to see if they're inconsistent. Another way, the Federal Government has a solution to this, it's that let one jury know how the other jury sentenced the other defendant. That's 18 U.S.C. 3592a4. And so there are ways to solve the problem of inconsistent verdicts across juries. Roberts. Roberts. That sounds pretty prejudicial to me. If the second case you said, oh, jury, consider this on individual circumstances, you know, these people act together. And by the way, a jury of your peers unanimously found beyond a reasonable doubt that this other guy should be sentenced to death, now do whatever you want with this guy. That sounds pretty prejudicial to me. Well, it's – if you think that's prejudicial, Mr. Chief Justice, then this proceeding was quite prejudicial, too, because the jury was asked to make that same exact comparison. But the specific prejudice we're alleging here is unique to these or at least quite restricted to the circumstances of this case. Kagan. Kagan. So, Mr. Luke, could you, for me, just tell me what is the specific prejudice you're alleging here? In other words, tell me more than just, oh, he was a corrupting influence. What evidence particularly came in? Sure. And why do you think it might have mattered to the jury? Just give me your, like, best shot. Sure. Well, the Kansas said there was no expert testimony on this, but that's wrong. Dr. Cunningham at Joint Appendix pages 324 to 329 explained how Jonathan looked up to Reggie, and every time they would get together, they would do drugs heavily  Reginald prompted someone to have sex with Jonathan. These are precisely the sort of evidence that shows that however bad you think Jonathan is, Reginald is worse, because Reginald is the one who created the person Jonathan is. It's, in a sense, making Reginald doubly culpable for these offenses, that, well, whatever you think Jonathan did, and yes, as Justice Scalia read, there were some horrific things done. Well, Reginald should be punished for not only everything Reginald did, but also everything Jonathan did. So this is precisely the sort of evidence that basically transfers all of Jonathan's actions to Reginald. And that's why it's so prejudicial when you get in the jury room. It's because it skews the weighing process. And the skewing of the weighing process is an error this Court has recognized for 30 years. This isn't something that we came up special for this case. This Court has recognized time and again that when a jury is told to consider an improper element in the weighing process, the weighing process is therefore skewed. And the only thing that can cure that error is either harmless error review or re-weighing by the State court. Scalia. But it has to have been harmless inasmuch as the person who was influenced by your client also got the death penalty. How can you say that what made the difference was the fact that your client was a corrupting influence upon his younger brother? Well, Justice Scalia, the State never established the identity of the shooter, and that is the key horrific act in this case. If the jury believed Jonathan was the shooter, then the jury might have given him the death penalty anyway, regardless of what Reginald did to him. I doubt whether that's the key. You really think that that's the only thing the jury is going to be focused on, is who pulled the trigger? My Lord. I don't think it's the only thing, but it's certainly the main thing, given that we're here on a capital murder charge. Do you think that on a retrial, they can't use the sister to prove that Reginald claimed he was the shooter? No. And I think that just highlights exactly how narrow our rule is. The evidence that Tameka said that Reginald told her that Reginald was the shooter goes to the circumstances of the crime. And that sort of finger-pointing, who shot who on the day of the crime, is going to fall comfortably within an existing sentencing factor and, as a result, is not going to skew the weighing process. So the only issue you think was prejudicial was that he was a corruptor? Absolutely. And for reasons I gave to Justice Kagan, that evidence was extremely prejudicial. It skewed the weighing process because it transferred Jonathan's culpability back onto Reginald's shoulders. If I may, I'd just like to address a few points raised by my friend from Kansas. He said the instructions solved the problem. Well, none of the instructions told the jury to consider this evidence about the corrupting influence only as to Jonathan. On the contrary, the instructions, instruction number two, told the jury consider the evidence applicable to each defendant. Well, this evidence was equally applicable to Reginald as it was to Jonathan. After all, it was Reginald's actions that were at issue. My friends also point to the instruction on statutory aggravators. But that disregards an entire swath of evidence that the jury heard that it could consider against Reginald. This was evidence, anti-mitigation evidence, that the jury considered could have caused them to remove weight from the mitigation side of the scale. And the instructions left the jury completely free to consider this evidence in anti-mitigation. My friends also suggest that I'm here only arguing an error of State law. Well, no less than the Petitioners were in Zant, Stringer, and Sanders. Each of those cases recognizes that a skewing of the weighing process has to be based on State law premises. That's why this Court in Zant went so far as to certify a question to the Georgia Supreme Court. Yes, it's true that to understand the effect on the weighing process, you have to look at the State law, but the mere admission of evidence isn't what causes the violation here. It's the admission of the evidence, followed by the fact the jury was required to consider it. And it was required to consider it because it was part and parcel of Jonathan's mitigating evidence. And this Court has said time and again that a defendant has a constitutional right for the jury not only to consider, but to listen to a defendant's mitigating evidence. So by considering this evidence for Jonathan, the jury necessarily considered it against Reginald. After all, if you're told that Reginald had a corrupting influence on Jonathan, you can't separate that as something for Jonathan and something for Reginald. It's equally applicable to both. My friend also suggested that we rejected a two-jury solution before trial. Well, we rejected that not because it wouldn't work to solve any prejudice in the penalty phase, but because it wouldn't work to solve any prejudice in the guilt phase. And remember, the Kansas Supreme Court found that it was actually error to keep the guilt phase joined, so we were perfectly appropriate in objecting to a two-jury solution at that phase of the trial. Ginsburg. And can you explain that again? I thought you sought only a severance at the sentencing phase. No, that's not that's not. You sought a severance totally. Exactly. Prior to trial, on pages 25 and 26 of the Joint Appendix, we moved for severance of the entire thing. And if you look at those pages, you'll see Jonathan's attorney, Jonathan's own attorney, saying that if the penalty phase is joined, he's going to have to present evidence that, quote, there's no way the State would be able to introduce if Reginald was sitting here alone. Well, his attorney was exactly right. That's exactly what happened many months later. I see that my time is up. Thank you, counsel. Mr. Green. Mr. Chief Justice, and may it please the Court, I'd like to first try and change the narrative here with some illustrations about the difference between the mitigation cases of both defendants. That's easily seen in the testimony of the experts. Reginald Carr presented evidence from a neuroscientist by the name of Dr. Woltersdorf that said his client had been diagnosed an incurable sociopath. Jonathan Carr's forensic psychologist, clinical and forensic psychologist, got up and testified that Jonathan was sensitive, he was affectionate, he had attempted suicide, and what he really was, contrary to what Mr. McAllister represented to you, was depressed and schizophrenic. That is a unique illustration of exactly how different these two defendants were in their presentation and why, again, a sequential penalty phase, even if they had been separate, wouldn't work. Reginald says he didn't want to hear or thought it would be prejudicial if the jury heard evidence from the — from Jonathan's witnesses about Reginald being a corrupting influence. On the other side, Jonathan doesn't want the jury to hear from Reginald's expert. And to answer your question, Justice Kagan, that's the evidence that would not have been introduced. Justice Woltersdorf's — or, excuse me, Dr. Woltersdorf's testimony about incurable sociopathy would not have been relevant or admissible— Kaganan. But maybe I'm missing something, but if your client's strategy was to make Reginald as bad — the bad actor in the case, why didn't that evidence actually go hand in hand with your client's strategy, which was to say it's all on Reginald? One would think that it would in a typical case, and it may be that some jurors had inferred that way. The problem was that the fact that the two brothers were sitting together allowed the prosecutors to repeatedly paint them with the same brush. And if we take a look, for example, at JA-402, the prosecutor says to the jury, in her opening argument at the beginning of the penalty — or at the conclusion of the penalty phase, ladies and gentlemen, they have the same eye color. They are now wearing glasses, although their mother said Reginald doesn't need them. They share some DNA. Breyer, so this — maybe you can, in your experience, cure what's bothering me about the case. It has nothing to do with the facts or for this concern. It has to do with Zafiro, and that's the ordinary case of joint trials. Right? And what the Court says is you can have the joinder as long as there isn't a serious risk that the joint trial would compromise. It doesn't say harmless error. It says compromise a specific trial right or prevent the jury from making a reliable judgment. That doesn't talk about harmless error. Now, that's the standard that's used in dozens and dozens and dozens of cases. Or if in this case we start talking about harmless error and that you can't have the joint proceeding if there is error that is not harmless, what have we done to that sentence? And what have we done to the trials that are joint in hundreds of cases that don't involve murder or death? That is the legal problem that is worrying me. And you will either cure that worry or say I've made some elementary mistake. It has nothing to do with your case. Say what you want, but I want to hear what you think. I don't think you've made any mistake at all, Justice Breyer. Indeed, I think that the State of Kansas and the Solicitor General are offering nothing more than the Zafiro test, using slightly different language. On page 15 of our law. So we should not use the words harmless error. We should quote from Zafiro and say could they make a reliable judgment. Now, that sounds harder on you, because if all you have to show is the error was harmful, it sounds like an easier task you have than to show that the jury wasn't reliable. Or are they the same thing in your opinion? I think they're the same thing, and I think that's a generalization. But we've offered a test that actually specifies it a little bit more, Justice Breyer, in terms of saying that the test should be whether there was a reasonable risk, and I'll explain the difference between reasonable and serious in a minute, but whether there was a reasonable risk that there would be evidence introduced, material, prejudicial evidence introduced that would, in fact, not have been introduced in a severed penalty phase proceeding. And to go back to Justice Kagan's question about the intuitive difference between these two things, between, excuse me, trials and penalty phase proceedings, the answer is that's because in a trial, the relative culpability of the defendants makes a big difference with respect to who's a conspirator, who's not a conspirator, who's a principal, who's an aider and a better. But when we turn to the penalty phase, the inquiry changes, as Mr. Liu indicated, it changes from exactly what happened to who this person is, and whether or not it was a conspirator or not, the jury wants to put this person to death. Roberts If you have separate proceedings, who gets to go second? Because obviously that person will have a significant advantage since he'll see all of the evidence presented in the other proceeding. And most of the evidence here was overlapping, so that at least you'll have the you'll be able to see what the State thought about that evidence. You have sort of a dry run if you're the second person. Well, in this case, respectfully, no, Mr. Chief Justice, because what the State basically said was we're relying on our evidence from the trial phase, or from the guilt phase of this capital trial. That's exactly what the prosecutor told the jurors when they turned into the penalty phase, and all that the prosecution did in the penalty phase was cross-examine the defense witnesses. But that cross-examination is important. Were there any common defense witnesses? There were family members, so it's true. Roberts So at least it would be helpful for the second person to go second to know, well, what did the prosecutor talk to you how did the prosecutor attempt to cross-examine that witness? Because I'm going to call the same witness. And her testimony is going to be a lot better the second time around, because you will know exactly what the cross-examination questions are going to be. That might happen. It could well be that that would be, I would consider that a minor advantage, Your Honor. But that could be handled by the judge with protective orders, with orders about rules against witnesses, and folks in the courtroom who have another proceeding. But I would submit, and then with respect to witnesses who might have been traumatized by these events, the, you know, a trial court could easily have simultaneous penalty proceedings, so that that witness would only have to testify once. The defense team on one side wouldn't get an advantage over the other. There would be two juries in two different courtrooms, same week, same days. The witness can go back and forth between courtrooms, and there's none of the advantage that the judge has. Alito, the State would have to put on basically its guilt phase case again at the penalty phase, right? Yes. It would have to do that. But I would imagine that with respect to cases like this, the defense attorneys are going to move right into what counts as stipulations. We'll read testimony. Well, I'm sure you'd like to stipulate to all the facts that were proven at the guilt phase, but I doubt that the State is going to want to stipulate to those. And the State might do that. And again, I think a trial court judge could easily handle that by expediting matters. And this is what happens in a lot of the Federal trials. I'd refer the Court to the brief of the Promise of Justice Initiative, which shows that when we have joint trials, we get joint results. When we have severed trials, we get severed results. Twenty-five for twenty-five joint trials, same result for the defendants. Woodson says we must have individualized sentencing at the penalty phase. So I don't see why the Sefiro test would work for penalty phase proceedings without some sort of change. There has to be some recognition that penalty phase proceedings are different than all the other armed robbery, drug-based proceedings. So how is that different from what the government said? So I think we ought to lower the risk standard. We ought to lower the risk standard to a reasonable risk standard. Not, and that's what we propose in our brief at page 15. We should lower the standard because that would recognize the acute need for reliability and accuracy when it comes to penalty phase proceedings and the decision whether somebody's going to live or die. You said you were going to make a distinction between serious and reasonable. Right. Earlier. Right. So a serious risk may be treated as a preponderance or above. With respect to reasonable, we're at a, maybe a likelihood, maybe that's perceived as 30% versus 55% or 60%, something like that. And indeed, this court said in Boyd, with respect to reasonable likelihood, that is not a preponderance standard. The court has no further questions. We'd urge- Thank you, counsel. Mr. McAllister, five minutes. Mr. Chief Justice, and may it please the court, I'll try to be brief. The only Eighth Amendment implication that this court has recognized that really applies to this case, I go back to the Romano case, where the court said, the admission of evidence that might or might not be in violation of state law is not an Eighth Amendment concern. The only time the Eighth Amendment comes into play is when the evidence involves constitutionally protected conduct. An example would be Dawson versus Delaware, where they sought a capital sentence. He was a member of the Aryan Brotherhood in prison. It had nothing to do with an aggravating factor. That was First Amendment protected activity. The court said that kind of thing could be an Eighth Amendment problem if you use it against the defendant. Their cases, I could be wrong, but I think all of their cases, and Stringer and others they refer to as skewing the weighing process, are not about admission of evidence, they are about invalid aggravating factors. So you basically told the jury there's something else literally on the scale, an aggravating factor that later the state says no, that was not correct. That should not have been there. That's distinguishable from this case. I agree completely with Justice Scalia's point, and the dissenting justice made it in the Kansas Supreme Court. If the evidence, the corrupting influence evidence, was so prejudicial to Reginald, why did Jonathan also get a death sentence? And I would close by saying that we all agree, I think, that the Constitution values accuracy and fairness, but it also values finality. And each of these individuals received an individualized sentence, presented all the evidence they wanted to. The jury was instructed to consider them individually, and if we were to undo this now, it would be very difficult for Kansas to go back. We'd be talking about having to redo all of the guilt phase evidence, and again, you get into question separate proceedings, traumatizing victims. Yet again, none of that is necessary, because at the end of the day, they got a fundamentally fair proceeding that gave each of them the sentence they deserved, and the jury found warranted, both under the facts of this case and the law of Kansas. We would ask that you reverse the Kansas Supreme Court on this point. Mr. McAllister, I'm sorry, but even if we do this and say that the sentencing didn't need to be severed, didn't the Kansas court hold on another ground that they were entitled to a new trial? Yes, that's the third question presented in the petition, which my understanding is that is something the court could reconsider. It's not denied. The court granted questions one and three. The other question that we presented was the only other ground that the Kansas Supreme Court gave for reversal. That's a confrontation clause violation in terms of some of the hearsay evidence presented in the sentencing proceeding. So if the court were to reverse on these, deny on that question, then the Kansas Supreme Court could, in fact, rely on that ground. But our hope would be that the court would do something different than that if you reverse on these two questions. Unless there are further questions, thank you. Thank you, counsel. The cases are submitted.